**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-00086-CNS-KAS

MICHELLE CARPENTER, et al.,

    Plaintiff,

v.

CELESTIAL SEASONINGS, INC.,

    Defendants.

---

**STIPULATED ORDER GOVERNING DISCOVERY OF
ELECTRONICALLY STORED INFORMATION**

---

Now come Plaintiffs Michelle Carpenter, *et al.*, and Defendant Celestial Seasonings, Inc, (collectively, the "Parties"), and hereby agree to the following protocol for production of electronically stored information and paper documents.

A.    **GENERAL AGREEMENTS**

    1.    **General**

        a.    This Stipulated Protocol for Electronically Stored Information and Hard Copy Documents ("Protocol") governs the production of all Electronically Stored Information ("ESI") and paper (hard copy) discovery in this matter ("Action").

        b.    The Parties agree that should a dispute arise out of the implementation of this Protocol, the Parties shall meet and confer in an attempt to resolve the dispute. All disputes arising out of this Protocol shall be resolved with reference to the agreements contained herein and the Federal Rules of Civil Procedure.

1

c.     Nothing in this Protocol shall limit a Party's right to object to any discovery request pursuant to any applicable rule or law, or to modify this Protocol through agreement of the Parties or through Court intervention.

d.     A Party producing documents or ESI will be referred to as the "Producing Party" and a Party receiving documents or ESI will be referred to herein as the "Receiving Party."

**2.     Proportionality of Discovery**

a.     The Parties will work together in good faith to identify appropriate limits on discovery, as necessary. These limits may include the number of custodians, discoverable data sources, the relevant time period, the permissible scope of requests for production, and the permissible scope of requests for emails, business instant message chats (such as Microsoft Teams and Slack), and other ESI. The Parties agree that working together in good faith means cooperating throughout this matter, including by meeting and conferring over any disagreements as may arise during the course of discovery before filing a motion to compel discovery. The Parties agree that requests for production of ESI, including requests for emails, shall be reasonably targeted, clear, and as specific as possible, rather than general discovery.

b.     Proportionality and Scope of Plaintiff ESI Discovery.

i.     Consistent with the proportionality requirement, the parties understand and agree that ESI discovery from named plaintiffs is limited to their own personal ESI from, for example, personal email accounts, personal computers, and social media accounts. The parties also understand and agree that what is reasonable and proportional to request and produce from the

2

named plaintiffs is different from that which is reasonable and proportional to request and produce from defendant. To that end, for any ESI discovery from named plaintiffs, plaintiffs will not be responsible for "load files" (defined in A.16), and "imaging" (defined in A.16) will be proportionate to the specific merits of the file in question. Plaintiffs agree to work cooperatively with defendant to ensure that defendant is able to obtain relevant discovery, including ESI, from plaintiffs, in a format that balances the needs of defendant with the burden on plaintiffs.

ii. The parties further agree that, prior to class certification, ESI discovery from absent class members will not be permitted, and the production of ESI by named plaintiffs will not be construed as a waiver of any objections to discovery from absent class members.

c. Custodians.

i. The Parties shall meet and confer to agree upon the identity of those custodians who are particularly likely to have discoverable information in their emails and other custodial documents ("Key Custodians") and relevant non-custodial data sources. Absent good cause, and subject to further agreement of the Parties, this list shall be the presumptive limit on ESI discovery. Should the Parties, through the discovery process, identify a legitimate

3

need to conduct additional reasonable and proportional discovery related to new Key Custodians, the Parties shall meet and confer on additional discovery. If an agreement between the Parties is not reached regarding the identity of the Key Custodians, the Parties will seek Court assistance to resolve the issue.

ii.    The Parties agree to take reasonable steps to identify and search the sources of potentially relevant and responsive information of each Key Custodian and non-custodial data source for collection and search, including but not limited to hard copy files, texts, e-mail repositories, and folders within shared network drives in which each Key Custodian places or maintains documents.

d.    <u>Discovery Concerning Preservation and Collection Efforts</u>. If, based upon good faith, there is a reasonable dispute concerning the scope of a Party's preservation or collection efforts, the Parties agree to meet and confer on the basis for such discovery, including the need for the requested discovery, relevance to claims or defenses of the action, proportionality of the proposed discovery, and the suitability of alternative means for obtaining the information.

e.    <u>Non-Discoverable ESI</u>. Pursuant to the proportionality standards under Federal Civil Rule 26(b)(1), and absent a Party's specific written notice for good cause, the following categories of ESI are presumed to be inaccessible and not discoverable:

4

i. Backup data files that are (a) maintained in the normal course of business for purposes of disaster recovery, including but not limited to backup tapes, disks, SAN, and other forms of media, and (b) substantially duplicative of data that are more accessible elsewhere;

ii. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system;

iii. Data in metadata fields frequently updated automatically, such as last opened or last-printed dates;

iv. Electronic data (e.g., email, calendars, contact data, notes, etc.) sent to or from mobile devices (e.g. iPhone, iPad and Android devices), provided that copies of all such electronic data are saved elsewhere (such as on a server, laptop, desktop computer or cloud storage). To the extent data is not saved elsewhere, responsive data shall be produced from mobile devices;

v. Voicemail, including Telephone or VOIP voice messages, not retained in the ordinary course of business or otherwise;

vi. Data remaining from systems no longer in use that is unintelligible on the systems in use;

vii. De-NISTing - Software files included on the National Institute of Standards and Technology (NIST) Modern RDS (minimal) list

obtained from https://www.nist.gov/itl/ssd/software-quality-group/national-softwarereference-library-nsrl/nsrl-download/current-rds;

f.    Disaster-Recovery Backup Data. Absent an agreement of the Parties or Court order, no Party shall be required to modify or suspend procedures, including rotation of backup media, used in the normal course of business to back up data and systems for disaster recovery purposes. This provision does not affect a Party's obligation to preserve data that is potentially relevant to this Action.

### 3.    No Designation of Discovery Requests

Productions of hard copy documents and ESI in the reasonably usable form set out in this Protocol, including Appendix A, need not be organized and labeled to correspond to the categories in the requests. Should a Receiving Party make a reasonable request for identification by Bates number of groups of Documents that the Producing Party can easily and readily identify, the Producing Party shall cooperate and provide such information as soon as reasonably practicable considering the scope of the request and the volume of Documents implicated.

### 4.    Clawback of Privileged Information

The production and clawback of privileged information is governed by the Joint Protective Order under Fed R. Evid 502(d) entered in this matter.

## B.    ELECTRONICALLY STORED INFORMATION

### 1.    Production in Reasonably Usable Form

a.    Rolling Production. The Parties may produce ESI on a rolling basis.

b.    Reasonably Usable Form. The Parties shall produce ESI in reasonably usable form. Except as stated in paragraphs B(2) through B(3) below, or as

6

agreed hereafter by the Parties, such reasonably usable form shall be the single-page, black and white, Group IV TIFF-image format (or substantially equivalent color images) with extracted or OCR text and associated metadata set out in Appendix A, which is incorporated in full in this protocol. Each Group IV TIFF version (or substantially equivalent color image) of an electronic document will be created directly from the corresponding native file. If the Receiving Party, for good cause explained in the request, seeks production in native format of specifically identified ESI produced originally in Group IV TIFF-image form (or in substantially equivalent color form), the Producing Party shall respond reasonably and in good faith to any such request.

c.    Redactions. The producing Party may redact from any Group IV TIFF image, metadata field, or native file, material (i) that is protected from disclosure by any applicable privilege or immunity, (ii) governed by applicable privacy law or regulation, or (iii) that the Agreed Confidentiality Order entered in this Action allows to be redacted. The basis for each redaction shall be annotated on the redaction itself. Redactions for privilege shall be included on a privilege log. For the avoidance of doubt, this Agreed Confidentiality Order shall not be construed to permit or prohibit redactions on grounds other than those specified above, including but not limited to redactions on the basis of relevance.

d.    Following the production of redacted documents, the parties may meet and confer on any reasonable requests from the Receiving Party to discuss the documents where the redactions are so substantial as to remove the context necessary to evaluate the asserted privilege, the basis for the redaction, make the relevant

7

portions of the record unintelligible, or if there is a legitimate and good faith basis for questioning the status or redaction of a document.

e.    Color. Where an original document contains color, the Parties will honor reasonable requests for re-production of a color image of the document if the Producing Party does not initially produce the document in color. Where a document is produced in color, images may be produced as single page, JPEG images. Video files (e.g., .wma, .mov, .mpg, .wmv, .avi, .asf) and computer animation files (e.g., .avi, .gif, .mpg, .gif, .mpg, .mpeg, .wmv) shall be produced in color.

### 2.    **Electronic Spreadsheets and Multimedia Files**

a.    Except if redacted, spreadsheets, such as Microsoft Excel files will be produced in native format with related searchable text, metadata, and bibliographic information.

b.    Except if redacted, photographs, video and any other audio/visual multimedia files will be produced in native format.

c.    When producing documents in native format, the Producing Party shall (i) insert into the production a "placeholder" file for the document to be produced elsewhere in native format or (ii) include a Group IV TIFF image of the native document in the sequence of the production indicating that the native file will be produced elsewhere in the production.

d.    Any produced native file will be named according to the first Bates number of the corresponding electronic document (e.g., [Production Number Begin].xlsx).

e.    No Party may request the production of documents in native format on a wholesale basis.

8

**3.**    **Structured Data from Enterprise Databases, Database Management Systems and other Structured Data**

a.    In instances in which discoverable electronically stored information in an enterprise database or database management system (e.g., Oracle, SQL server, DB2) can be produced in an already existing and reasonably available report, the Parties shall collect and produce, in the reasonably usable Group IV TIFF-image form described in Appendix A, the discoverable material in that report format. If an existing report form is not reasonably available, the Parties shall export from the original database discoverable information in a format compatible with Microsoft Excel or Microsoft Access, and the information shall be produced in that native format.

**4.**    **Additional Procedures for Native Format Files**

a.    Procedures for assigning production numbers and confidentiality information to files produced in native format are addressed in Appendix A, Paragraph A.17.

b.    Any Party seeking to use, in any proceeding in this Action, files produced in native format shall do so subject to the following:

i.    If the native file has been converted to Group IV TIFF-image (or a substantially equivalent color image) or hard copy, the original production number and confidentiality designation shall be stamped on each page of the resulting Group IV TIFF-image or hard copy document representing the original native-format file, with a suffix added to the production number to identify the particular page in the file (e.g., XYZ00001_001).

9

ii.     Use of a file in native format, or use of a Group IV TIFF-image

(or substantially equivalent color image) or hard copy document

representing the original native-format file shall constitute a

representation that the file being used is an accurate and

complete depiction of the original native-format file.

**5.     Use of Search Terms and Filters**

a.     To contain costs in the identification of relevant ESI for review and

production, the Parties agree to meet and confer to discuss the use of reasonable

search terms, proximity filters, file types among other possible filters, or the use of

advanced search and retrieval technologies, such as predictive coding or other

technology-assisted review.

b.     In meeting and conferring on the use of search terms, the Producing

Party shall first disclose its search filters to the Receiving Party, and if the Receiving

Party believes in good faith that use of the disclosed search filters may result in

deficiencies in production, the Receiving Party may make prompt, reasonable requests

for different or additional searches/terms. The Producing Party shall respond reasonably

to such requests and meet and confer if necessary. Should the Parties meet and confer

on the basis of proportionality of a specific term, the Parties will negotiate in good faith

to resolve any differences prior to seeking Court intervention, including advising the

Receiving Party as to the hit count of the term in question if necessary. Any proposed

search filters shall be tailored to the particular claims and defenses at issue and

proportional to the needs of the case, in accordance with the Federal Rules.

c.     The fact that any electronic file has been identified in agreed-upon

searches shall not prevent any Party from withholding such file from production on the

10

grounds that the file is not responsive, protected from disclosure by applicable privilege or immunity, governed by the applicable privacy laws or regulations, or that any Protective Order entered in this Action allows the file to be withheld.

  d. Nothing in this section shall limit a Party's right to reasonably seek agreement from the other Parties or a court ruling to modify previously agreed-upon search terms.

  **6.** **Email Threading**

  a. Email threads are email communications that contain prior or lesser-included email communications that also may exist separately in the Party's electronic files. A most inclusive email is one that contains all of the prior or lesser-included emails, including attachments, for that branch of the email thread. The Parties agree that removal of wholly-included, prior-in-time, or lesser-included versions from potential production will reduce all Parties' costs of document review, production, and litigation-support hosting. Accordingly, each Party may produce or list on any required privilege log, only the most inclusive email in an email thread, provided that email threading is performed by an industry standard eDiscovery tool and not performed manually.

  b. Following production of most inclusive email threads, and for good cause and subject to the proportionality standard, a Receiving Party may make reasonable requests for individual lesser-included emails. The Producing Party shall cooperate reasonably in responding to any such requests if the requested lesser-included emails otherwise would have been subject to production.

  c. For the avoidance of doubt, nothing in this Protocol shall be construed to require any Party to thread emails.

**7.**   **De-Duplication**

a.   "Duplicate ESI" means files that are exact duplicates based on the files' MD5 or SHA-1 hash values. The Producing Party need produce only a single copy of responsive Duplicate ESI. A Producing Party shall take reasonable steps to de-duplicate ESI globally (i.e., both within a particular custodian's files and across all custodians). Entire document families may constitute Duplicate ESI. De-duplication shall not break apart families. When the same Duplicate ESI exists in the files of multiple custodians, those persons shall be listed in the Custodian field identified in Paragraph A.16(c) of Appendix A.

**C.**   **DOCUMENTS THAT EXIST IN ONLY HARD COPY (PAPER) FORM**

1.   The Parties may produce documents that exist in the normal course of business only in hard copy form either (a) in their original hard copy form or (b) scanned and produced, redacted as necessary, in accordance with the procedures set out in Appendix A. Except as set forth above, the scanning of original hard copy documents does not otherwise require that the scanned images be treated as ESI.

2.   All paper documents shall be produced as Group IV TIFF images with related Optical Character Recognition ("OCR") text files and a cross-referenced load file, according to the specifications set forth in Appendix A.

**D.**   **CONFIDENTIALITY**

The Parties incorporate the provisions of the Agreed Confidentiality Order concerning protection of confidential or otherwise sensitive information agreed to by the Parties and entered by the Court. For the avoidance of doubt, nothing in the Agreed

Confidentiality Order shall supersede or alter the protections contained therein concerning the protection of confidential or otherwise sensitive information.

**E.      COSTS OF PRODUCTION**

Each Party shall bear its own costs of production, but no Party waives the right to seek reimbursement in the future for costs of production, pursuant to the Federal Rules of Civil Procedure, other applicable rules, or other applicable case law.

**F.      CLAIMS OF PRIVILEGE**

1.      Any document falling within the scope of any request for production or subpoena that is withheld on the basis of a claim of attorney-client privilege, work product, or any other claim of privilege or immunity from discovery is to be identified by the Producing Party in a privilege log within sixty (60) days after the commencement of its initial rolling production and shall supplement its privilege log each thirty (30) days thereafter until the substantial completion of the Producing Party's document production. The Producing Party shall produce a complete privilege log no later than thirty (30) days following the substantial completion of its document production.

2.      The privilege log must contain sufficient information for the Receiving Party to evaluate the Producing Party's claim(s) of privilege.  Nothing in this Protocol shall be construed to permit or prohibit the use of a categorical privilege log rather than a document-by-document log.

3.      Notwithstanding a claim of privilege, any document containing both privileged and non-privileged matter must be produced with the purportedly privileged portion redacted, with the redacted portion indicated on the document itself. For emails,

13

the bibliographic information (to/from/cc/bcc/date sent/time sent/subject) will not be
redacted unless the information is itself privileged.

4.      Privileged communications involving in-house or outside counsel related
to this Action do not need to be identified on a privilege log if those communications
occurred on or after the filing of the complaint in this matter.

5.      Following the receipt of a privilege log, a Receiving Party may identify, in
writing, the particular documents that it believes require further explanation within thirty
(30) days of receipt of the privilege log. Within fifteen (15) days of such an identification,
the Producing Party must respond to the request. If a Party challenges a request for
further information, the Parties shall meet and confer to try to reach a mutually
agreeable solution. If they cannot agree, the matter shall be brought to the Court.

6.      Notwithstanding paragraph F.1 of this Protocol, a Party's failure to
produce a privilege log or to identify a document on a privilege log by the deadlines set
forth in paragraph F.1 shall not, standing alone, be construed as a waiver of that Party's
claims of privilege.


SO ORDERED, this __ day of _____, 2026.

_____

U.S.M.J


**Stipulated and agreed:**

14

By:  */s/ Kara A. Elgersma*

Kenneth A. Wexler
Kara A. Elgersma
Andrew Yoder
**Wexler, Boley & Elgersma LLP**3
11 South Wacker Drive
Suite 5450
Chicago, Illinois 60606
(312) 346-2222
kaw@wbe-llp.com
kae@wbe-llp.com
ay@wbe-llp.com
Mark R. Miller
Julia Ozello
Matthew J. Goldstein
**Wallace Miller**
200 West Madison Street
Suite 3400
Chicago, IL 60606
(312) 261-6193
mrm@wallacemiller.com
jo@wallacemiller.com
mjg@wallacemiller.com

Attorneys for Plaintiffs

By:  */s/ Alexander M. Smith*

Dean N. Panos
**Jenner & Block LLP**
353 N. Clark Street
Chicago, IL 60654-3456
(312) 923-2765
dpanos@jenner.com

Alexander M. Smith
**Jenner & Block LLP**
2029 Century Park East
Suite 1450
Los Angeles, CA 90067
(213) 239-2262
asmith@jenner.com

Attorneys for Defendant

## <u>APPENDIX A</u>

## <u>STIPULATION REGARDING ELECTRONICALLY STORED
INFORMATION AND HARD COPY PROTOCOL</u>

A.1.    <u>Image Files</u>. Files produced in *.tif image format will be single page black and white *.tif files at 300 DPI, 8 ½ x 11 inch page size, Group IV compression. To the extent possible, original orientation will be maintained (i.e., portrait-to-portrait and landscape-to-landscape). Each *.tif file will be assigned a unique name matching the production number of the corresponding page. Such files will be grouped in folders of no more than 1,000 *.tif files each unless necessary to prevent a file from splitting across folders. Files will not be split across folders and separate folders will not be created for each file. Production ("Bates") numbers shall be endorsed on the lower right corner of all images. This number shall be a unique, consistently formatted identifier that will:

a.    be consistent across the production;

b.    contain no special characters; and

c.    be numerically sequential within a given file.

Bates numbers should be a combination of an alpha prefix along with a 6 digit number (e.g., ABC_000001). The number of digits in the numeric portion of the Bates number format should not change in subsequent productions. Confidentiality designations, if any, will be endorsed on the lower left corner of all images and shall not obscure any portion of the original file.  Nothing in this paragraph prevents a Producing Party, at its election or upon reasonable request from a Receiving Party, from producing image files in color.

A.2.    <u>File Text</u>. Except where ESI contains text that has been redacted under assertion of privilege or other protection from disclosure, full extracted text will be

A1

provided in the format of a single *.txt file for each file (i.e., not one *.txt file per *.tif image). Where ESI contains text that has been redacted under assertion of privilege or other protection from disclosure, the redacted *.tif image will be OCR'd and file-level OCR text will be provided in lieu of extracted text. Searchable text will be produced as file-level multi-page UTF-8 text files with the text file named to match the beginning production number of the file. The full path of the text file must be provided in the *.dat data load file.

A.3.    Unitization. A unitization file, in standard format (e.g., Concordance, Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range, will accompany each Group IV TIFF document. The unitization of the document and any attachments shall be maintained as it existed in the original when creating the image file. The relationship of documents in a document collection (e.g., cover letter and enclosures, email and attachments, binder containing multiple documents, or other documents where a parent-child relationship exists between the documents) shall be maintained through the scanning or conversion process. If more than one level of parent-child relationship exists, documents will be kept in order, but will be treated as children of the initial parent document. Such information shall be produced in the load file, in a manner to enable the parent-child relationship among documents in a document collection to be reconstituted by the Receiving Party in commercially available document management software such as Concordance.

A.4.    Word Processing Files. Word processing files, including without limitation Microsoft Word files (*.doc and *.docx), will be produced as images, with tracked changes, comments and hidden text showing.

A.5.    Presentation Files. Presentation files, including without limitation Microsoft PowerPoint files (*.ppt and *.pptx), will be produced as images, with comments, hidden slides, speakers' notes, and similar data in such files.

A.6.    Spreadsheet or Worksheet Files. To the extent that spreadsheet files, including without limitation Microsoft Excel files (*.xls or *.xlsx), are produced in *.tif image format, such *.tif images will display hidden rows, columns, and worksheets, if any, in such files.

A.7.    Parent-Child Relationships. Parent-child relationships (e.g., the associations between emails and their attachments) will be preserved. Email and other ESI attachments will be produced as independent files immediately following the parent email or ESI record. Parent-child relationships will be identified in the data load file pursuant to paragraph A.16 below.

A.8.    Dynamic Fields. Files containing dynamic fields such as file names, dates, and times will be produced showing the field code (e.g., "[FILENAME]" or "[AUTODATE]"), rather than the values for such fields existing at the time the file is processed.

A.9.    English Language. To the extent any data exists in more than one language, the data will be produced in English, if available. If no English version of a file is available, the Producing Party shall not have an obligation to produce an English translation of the data.

A3

A.10.  <u>Embedded Objects</u>. Some Microsoft Office and .RTF files may contain embedded objects. Such objects typically are the following file types: Microsoft Excel, Word, PowerPoint, Project, Outlook, and Access, and PDF. Objects with those identified file types shall not be extracted as separate files or produced as attachments to the file in which they were embedded. Following production of documents containing embedded objects, the Parties may meet and confer on reasonable requests to produce certain embedded objects on a file by file basis.

A.11.  <u>Compressed Files</u>. Compressed file types (i.e., .CAB, .GZ, .TAR. .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual files.

A.12.  <u>Encrypted Files</u>. The Producing Party will take reasonable steps, prior to production, to unencrypt any discoverable electronically stored information that exists in encrypted format (e.g., because password-protected) and that can be reasonably unencrypted. This provision does not require a forensic level tool or password cracking software to be utilized to decrypt a document. The Parties agree to meet and confer in good faith to discuss any encrypted file that could not be unencrypted under this provision.

A.13.  <u>Fixed Notes</u>. For documents that contain fixed notes (e.g., "post-it notes"), the pages will be scanned or converted both with and without notes and those pages will be treated as part of the same document. If the burden on the Producing Party associated with production of documents with fixed notes becomes unreasonable, the Parties agree to meet and confer on the requirements of this subparagraph.

A4

A.14. <u>Scanned Hard copy Documents:</u>

    a. In scanning hard copy documents, multiple distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., hard copy documents should be logically unitized).

    b. OCR for scanned images of hard copy documents should be performed on a document level and provided in document-level *.txt files named to match the production number of the first page of the document to which the OCR text corresponds. OCR text should not be delivered in the data load file or any other delimited text file.

    c. In the case of an organized compilation of separate hard copy documents—for example, a binder containing several separate documents behind numbered tabs—the document behind each tab should be scanned separately, but the relationship among the documents in the binder should be reflected in proper coding of the family fields set out below.

A.15. <u>Production Numbering.</u>

In following the requirements of Paragraph A.1, the Producing Party shall take reasonable steps to ensure that attachments to documents or electronic files are assigned production numbers that directly follow the production numbers on the documents or files to which they were attached. If a production number or set of production numbers is skipped, the skipped number or set of numbers will be noted. In addition, wherever possible, each *.tif image will have its assigned production number

electronically "burned" onto the image.

A.16.  <u>Data and Image Load Files.</u>

a.  <u>Load Files Required</u>. Unless otherwise agreed, each production will include a data load file in Concordance (*.dat) format and an image load file in Opticon (*.opt) format

b.  <u>Load File Formats</u>.

i. Load file names should contain the volume name of the production media. Additional descriptive information may be provided after the volume name. For example, either ABC001.dat or ABC001_metadata.dat would be acceptable.

ii. Unless other delimiters are specified, any fielded data provided in a load file should use Concordance default delimiters. Semicolon (;) should be used as multi-entry separator.

iii. Any delimited text file containing fielded data should contain in the first line a list of the fields provided in the order in which they are organized in the file.

c.  <u>Fields to be Included in Data Load File</u>. For all documents or electronic files produced, the following metadata fields for each document or electronic file, if available at the time of collection and processing and unless such metadata fields are protected from disclosure by attorney-client privilege or work-product immunity or otherwise prohibited from disclosure by law or regulation, including any applicable privacy regulation or law, will be provided in the data load file pursuant to subparagraph (a),

above, except to the extent that a document or electronic file has been

produced with redactions. The term "Scanned Docs" refers to documents

that are in hard copy form at the time of collection and have been scanned

into *.tif images. The term "Email and E-Docs" refers to files that are in

electronic form at the time of their collection.

| Field | Sample Data | Scanned Docs | Email and E-Docs | Comment |
|---|---|---|---|---|
| PRODBEG | ABC00000001 | Yes | Yes | Beginning production number |
| PRODEND | ABC00000008 | Yes | Yes | Ending production number |
| PRODATTCOUNT | 3 | N/A | Yes | Number of attachments to a document |
| PRODBEGATT | ABC00000009 | Yes | Yes | Beginning production number of a parent in a family |
| PRODENDATT | ABC00001005 | Yes | Yes | Ending production number of last page of the last attachment in a family |
| ALL CUSTODIANS | Smith, John | Yes | Yes | Custodian(s) that possessed the document or electronic file—multiple custodians separated by semicolon |
| NATIVEFILE | Natives\001\001\ABC00000001.xls | N/A | Yes | Path and file name for native file on production media |
| FILEDESC | Microsoft Office 2007 Document | N/A | Yes | Description of the type file for the produced record |
| FOLDER | \MyDocuments\Document1.doc | N/A | Yes | Original source folder for the record produced |
| FILENAME | Document1.doc | N/A | Yes | Name of original electronic file as collected |
| DOCEXT | Document1.doc | N/A | Yes | File extension for email or e-doc |
| PAGES | 2 | Yes | Yes | Number of pages in the produced document or electronic file (not applicable to native file productions) |
| AUTHOR | John Smith | N/A | Yes | Author information as derived from the properties of the document |

A7

| DATECREATED | 10/9/2020 | N/A | Yes | Date that non-email file was created as extracted from file system metadata |
| DATELASTMOD | 10/10/2020 | N/A | Yes | Date that non-email file was modified as extracted from file system metadata |
| LASTSAVEDBY | John Smith | N/A | Yes | Name of individual who last saved non-email file as extracted from metadata |
| SUBJECT | Change to Access Database | N/A | Yes | "Subject" field extracted from email message or metadata properties of the document |
| FROM | John Beech | N/A | Yes | "From" field extracted from email message |
| TO | Janice Birch | N/A | Yes | "To" field extracted from email message |
| CC | Frank Maple | N/A | Yes | "Cc" or "carbon copy" field extracted from email message |
| BCC | John Oakwood | N/A | Yes | "Bcc" or "blind carbon copy" field extracted from email message |
| DATESENT | 10/11/2020 | N/A | Yes | Sent date of email message (mm/dd/yyyy format) |
| TIMESENT | 10:33 AM | N/A | Yes | Sent time of email message, time zone set to GMT |
| DATERCVD | 10/11/2020 | N/A | Yes | Received date of email message (mm/dd/yyyy format) |
| TIMERCVD | 10:33 AM | N/A | Yes | Received time of email message, time zone set to GMT |
| READ_UNREAD | Unread | N/A | Yes | "Read" or "unread" status of an email message |
| IMPORTANCE | High Importance | N/A | Yes | Importance Designations given to email documents extracted from email message |
| HASHVALUE | e4d909c290d0fb1ca068ffadd f22cbd0 | N/A | Yes | MD5 or SHA-1 hash value |
| CONFIDENTIALITY | HIGHLY CONFIDENTIAL | Yes | Yes | Text of confidentiality designation, if any |
| TEXTPATH | Text\001\001\ABC00000001.txt | N/A | Yes | Path to *.txt file containing extracted or OCR text |

A8

| PRODVOL | VOL001 | N/A | Yes | Name of the Production Volume |
|---|---|---|---|---|
| APPTDATE_START | 10/10/2020 5:00:00 pm | N/A | Yes | Calendar appointment start date and time |
| APPTDATE_END | 10/13/2020 1:30:00 pm | N/A | Yes | Calendar appointment end date and time |
| "Sort Date/Time" metadata field | 02/24/2021 4:00:00 PM | N/A | Yes | Date & Time taken from (Email) Date/Time Sent, (Email) Date/Time Rcvd, or (Edocs) Date/Time Last Modified, repeated for parent document and all children items to allow for date sorting. Formatted as: mm/dd/yyyy hh:mm:ss AM/PM |

A.17.  <u>Files Produced in Native Format</u>. Any electronic file produced in native file format shall be given a file name consisting of a unique Bates number and, as applicable, a confidentiality designation; for example, "ABC_000002_[Original File Name]_Confidential." For each native file produced, the production will include a *.tif image slipsheet indicating the production number of the native file and the confidentiality designation, and stating "File Provided Natively." To the extent that it is available, the original file text shall be provided in a file-level multi-page UTF-8 text file with a text path provided in the *.dat file; otherwise the text contained on the slipsheet shall be provided in the *.txt file with the text path provided in the *.dat file.

A.18.  <u>Production Media</u>. Unless otherwise agreed, documents and ESI will be produced on external hard drive, secure FTP site, or similar electronic format. Such media should have an alphanumeric volume name; if a hard drive contains multiple volumes, each volume should be contained in an appropriately named folder at the root of the drive. Volumes should be numbered consecutively (ABC001, ABC002, etc.). Deliverable media should be labeled with the name of this action, the identity of the

A9

producing Party, and the following information: Volume name, production range(s), and date of delivery.

A.19.   <u>Encryption of Production Media</u>. To maximize the security of information in transit, any media on which documents or electronic files are produced may be encrypted by the Producing Party. In such cases, the Producing Party shall transmit the encryption key or password to the Receiving Party, under separate cover, contemporaneously with sending the encrypted media.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2026, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to

Counsel of Record.

*s/ Kara A. Elgersma*